UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

| | |
|---|---|
| SECURITIES AND  EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| ADVANCED EQUITY PARTNERS, LLC, | ) |
| PREMIERE CONSULTING, LLC, | ) |
| PETER D. KIRSCHNER, and | ) |
| STUART M. RUBENS, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

Plaintiff Securities and Exchange Commission alleges as follows:

## I. INTRODUCTION

1.      The Commission brings this action against Advanced Equity Partners, LLC ("Advanced Equity"), Premiere Consulting, LLC ("Premiere"), Peter D. Kirschner and Stuart M. Rubens (collectively, "Defendants") for violations of the registration and antifraud provisions of the federal securities laws.

2.      From no later than July 2011 until at least November 2012, in an unregistered offering, the Defendants, directly and through the services of their sales agents, offered and or sold Thought Development, Inc. ("TDI") stock to approximately 200 investors located throughout the United States, most of whom were senior citizens, and some of whom were also unaccredited.

3.      TDI developed a laser-line system that could be used in professional and collegiate sporting events.  The Defendants and their sales agents lured victims into investing in

TDI by making false promises about investment returns on and timing of a purportedly pending initial public offering ("IPO").  Premiere and Advanced Equity's sales agents also mislead investors concerning the status of negotiations by TDI with the National Football League ("NFL"), including the use of TDI's technology at the 2013 Super Bowl.

4.      The Defendants and their sales agents also failed to disclose to investors that they retained or paid their sales agents transaction-based commissions or other fees of at least 75% of investor proceeds, and misrepresented to investors their funds would be used to develop TDI's technology and bring the company public.

5.      Even after TDI terminated them, Kirschner, Rubens and their sales agents continued soliciting investors on behalf of their new company, Advanced Equity, while duping investors into believing they had purchased shares of TDI, when in fact they had not.  Not only did these investors fail to receive TDI stock certificates, but Kirschner and Rubens used nearly all of investor funds for personal use and to pay their sales agents.

6.      As a result of the conduct described in this Complaint, the Defendants violated Sections 5(a), 5(c) and 17(a)(1), (2), and (3) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1), 77q(a)(2), 77q(a)(3); and Sections 10(b), 15(a) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), 15 U.S.C. § 78o(a) and 17 C.F.R. § 240.10b-5.   Unless restrained and enjoined, the Defendants are reasonably likely to continue to violate the federal securities laws.

7.      The Commission respectfully requests that the Court enter: (a) a permanent injunction restraining and enjoining the Defendants from violating the federal securities laws; (b) an order directing the Defendants to pay disgorgement with prejudgment interest; (c) an order

directing the Defendants to pay civil money penalties; and (d) an order barring Kirschner and Rubens from participating in any offering of a penny stock.

## II. DEFENDANTS AND RELATED ENTITY

### A. Defendants

8.      Kirschner, resides in Delray Beach, Florida and is a former managing member of Premiere and a current managing member of Advanced Equity.   He and Rubens founded Premiere and Advanced Equity and hired and paid sales agents to solicit investors to purchase unregistered stock in TDI.   In 2006, Kirschner agreed to enter into a judgment permanently enjoining him from future violations of the antifraud provisions of federal securities laws. During the relevant time period of that action, Kirschner was associated with an unregistered broker-dealer.  Pursuant to the consent and judgment, Kirschner agreed to disgorge $109,400 in ill-gotten gains plus pre-judgment interest, and pay a $55,000 civil money penalty.  Kirschner also agreed to be barred from association with any broker or dealer, with the right to reapply for association after five years.  Kirschner has not exercised his right to reapply.

9.      Rubens, resides in North Miami, Florida and is a managing member of both Premiere and Advanced Equity.  Rubens has been subject to two formal actions for violations of investment-related rules or regulations.  In 1999, the New York Stock Exchange Division of Enforcement censured Rubens and imposed a one-month bar for improperly giving guarantees to one or more customers in connection with the yields on certain high-yield bonds.  In connection with the same matter, the Florida Division of Securities entered a cease-and-desist order against Rubens in 2000, preventing him from seeking registration for a period of one year for unsuitable recommendations and excessive trading.

10.     Advanced Equity Partners, LLC is a Florida limited liability company formed in February 2012.  Its principal place of business is located in Hollywood, Florida.  It has never been registered with the Commission in any capacity and has not registered any offering of securities under the Securities Act or a class of securities under the Exchange Act.

11.     Premiere Consulting, LLC is a Florida limited liability company formed in May 2010.  Its principal place of business is located in Hollywood, Florida.  It has never been registered with the Commission in any capacity and has not registered any offering of securities under the Securities Act or a class of securities under the Exchange Act.

## B. Related Entity

12.     TDI was incorporated in 2010 with its principal place of business in Miami Beach, Florida.  It has never been registered with the Commission in any capacity and has not registered any offering of securities under the Securities Act or a class of securities under the Exchange Act.

## III. JURISDICTION AND VENUE

13.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d) and 77v(a); and Sections 21(d), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e) and 78aa.

14.     The Court has personal jurisdiction over the Defendants and venue is proper in the Southern District of Florida because many of the Defendants' acts constituting violations of the Securities Act and the Exchange Act occurred in the District.  More specifically, the Defendants solicited investors and sold securities and recruited sales agents who solicited investors and sold securities from offices in Hollywood, Tamarac and Fort Lauderdale.  In addition, proceeds from the fraudulent sale of securities flowed in and transaction-based

payments to sales agents came out of bank accounts located in Hollywood.  Moreover, Kirschner
and Rubens reside in the Southern District of Florida.

15.     In connection with the conduct alleged in this Complaint, the Defendants,
directly and indirectly, singly or in concert with others, made use of the means or
instrumentalities of interstate commerce, the means and instruments of transportation and
communication in interstate commerce, and the mails.

## IV. FACTUAL ALLEGATIONS

### A. Background of TDI and Relationship with Premiere, Kirschner and Rubens

16.     TDI was incorporated in 2010 to develop and market a portfolio of products and
inventions, including a laser-line system designed to mark first downs in professional and
collegiate football games, including the NFL.  TDI states that its laser system generates a green
line on the field which is visible in the stadium to players, fans and on television.  TDI represents
that use of its technology would decrease the time used by officials to determine first downs and
generate more time to be sold to television advertisers.

17.     Sometime in early 2010, TDI began to raise capital by selling unregistered TDI
stock.  About the same time, TDI's legal counsel mentioned the company's goal of raising
capital to Kirschner.  Soon thereafter, Kirschner and Rubens met with TDI's chairman to discuss,
among other things, how they could help TDI raise capital.

18.     TDI eventually entered into an agreement with Premiere, Kirschner and Rubens to
solicit investors to raise capital by selling TDI stock.  TDI allocated Premiere a block of
restricted stock which Premiere paid for on an ongoing basis as they resold the stock to investors.
Ultimately, Premiere paid approximately $200,000 to TDI pursuant to this agreement.

## B. **The Solicitation of TDI Stock**

19.     Premiere, Kirschner and Rubens solicited investors and received transaction-based compensation in the form of undisclosed commissions and other fees derived from investors' proceeds.  In addition, Premiere, Kirschner and Rubens recruited others to act as sales agents and paid them transaction-based compensation.

20.     No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the TDI stock Premiere, Kirschner, Rubens and their sales agents offered and sold and no exemption from registration existed with respect to these securities and transactions.

21.     Neither Premiere nor its sales agents provided investors a TDI private placement memorandum, financial information, or company risk disclosures during their solicitations – other than general company information available on TDI's website.

22.     Kirschner, Rubens and their sales agents, failed to disclose material information to investors, including the exorbitant commissions and other fees charged to investors and the actual use of investor proceeds.  In addition, Premiere, Rubens and their sales agents, made material misrepresentations to investors regarding the expectant timing of and return on a purported TDI IPO of its stock.  Moreover, the sales agents made additional material misrepresentations on behalf of Premiere regarding the status of negotiations with the NFL and the use of TDI's technology by certain teams and stadiums, or in the 2013 Super Bowl.

23.     Premiere and its sales agents instructed investors to send, and investors did send, all payments for TDI stock transactions to bank accounts Kirschner and Rubens held or controlled.  Kirschner and Rubens used these bank accounts to pay sales agents.

24.     Premiere, Kirschner and Rubens retained or paid their sales agents undisclosed, commissions and other fees of at least 75% of the offering proceeds.

25.     From July 2011 through February 2012, Premiere raised approximately $1.36 million from approximately 98 investors located nationwide. During that same time, Premiere, Kirschner and Rubens paid approximately $630,000 to their sales agents and retained approximately $440,000 in bank accounts they held or controlled.

26.     In late 2011, TDI learned of the undisclosed commissions and other fees charged to investors and of certain misrepresentations made to investors, and terminated its relationship with Premiere.

### C. Kirschner and Rubens' Scheme to Defraud Investors and the Formation of Advanced Equity Partners

27.     After TDI terminated its relationship with Premiere, Kirschner and Rubens formed Advanced Equity in February 2012, and continued to solicit investors and sell purported stock in TDI.

28.     No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the purported TDI stock Advanced Equity, Kirschner, Rubens and their sales agents offered and sold and no exemption from registration existed with respect to these securities and transactions.

29.     Advanced Equity, Kirschner, and Rubens used many of the same sales agents and made some of the same material misrepresentations and omissions to investors they had made while soliciting TDI investors for Premiere.

30.     Advanced Equity, Kirschner, Rubens and their sales agents made additional material misrepresentations and omissions to lead investors to believe that they had purchased shares of TDI stock when, in fact, they had not.

7

31.     Advanced Equity, Kirschner, Rubens and their sales agents generated and forwarded false documents to investors, including, in some instances, stock purchase agreements.  In addition, Advanced Equity sales agents generated and forwarded to investors false transaction confirmation letters indicating purchases of TDI stock.  But instead of delivering shares of TDI, as agreed upon, investors received shares of Advanced Equity or, in some cases, no shares at all.

32.     Advanced Equity and its sales agents instructed investors to send, and investors did send, payments for the purchase of purported TDI stock to bank accounts Kirschner and Rubens held or controlled.  Kirschner and Rubens used these bank accounts to pay sales agents.

33.     From February 2012 until at least November 2012, Advanced Equity raised approximately $1.076 million from at least 100 investors located nationwide.  During that same time period, Advanced Equity, Kirschner and Rubens paid approximately $315,000 to the sales agents they recruited and retained approximately $750,000 in bank accounts they held or controlled.

34.     The Defendants sold TDI stock or purported TDI stock to investors without inquiring or obtaining information as to whether they qualified as accredited investors.  Some of these investors were, in fact, unaccredited.

35.     Neither the Defendants nor their sales agents were registered as broker-dealers or associated with a registered broker-dealer while facilitating and participating in these securities sales.

36.     Approximately two-thirds of the investors who submitted funds to Premiere or Advanced Equity were age 65 or older.

## B. Misrepresentations and Omissions

37.      In connection with the offering of securities during the relevant period, the Defendants made material misrepresentations and omissions to investors.

### 1. *Undisclosed Exorbitant Commissions or Other Fees and Use of Proceeds*

38.      The Defendants failed to disclose to investors they retained or paid their sales agents commissions and other fees of at least 75% of the offering proceeds.

39.      For example, Advanced Equity sales agents lied to a 79 year-old retiree living on a fixed income regarding commissions or other fees connected with the purchase of purported TDI stock. Advanced Equity sales agents told him they would only take a commission if, in the future, he resold the stock at a profit. In reality, Advanced Equity, Kirschner and Rubens immediately paid their sales agents $15,000 of the $27,000 invested in commissions or other fees and kept the rest of the investor proceeds.

40.      Kirschner and Rubens also knew their sales agents did not disclose to investors the exorbitant commissions and other fees paid from the offering proceeds.

41.      The Defendants and their sales agents represented to investors that the offering proceeds would be used for the development of TDI's technology and to fund a purported IPO of TDI stock, when, in fact, they were not.

### 2. *False Promises about Pending IPO and Investment Returns*

42.      Premiere, Advanced Equity, Rubens and their sales agents falsely promised investors that TDI was about to go public, when the Defendants knew TDI had not taken any of the required steps necessary for the company to go public.

43.     In addition, Premiere, Advanced Equity, Rubens and their sales agents falsely promised investors guaranteed returns, and that the value of TDI stock would increase significantly from $2.50 per share, when in fact, TDI had no immediate plans to go public and there was no basis for these statements.

44.     For example, Rubens directly solicited a 77 year-old retiree to invest in TDI in February 2012.  After the retiree decline to invest, Rubens and his sales agents engaged in high pressure sales tactics and further enticed him with false promises about "guaranteed returns." Advanced Equity later sent the retiree a false trade confirmation letter to deceive him into believing he had purchased $100,000 worth of TDI shares when, in fact, he had not.  Ultimately, the retiree relented to the pressure and invested $25,000.

### 3. *Sale of Purported TDI Stock*

45.     Advanced Equity, Kirschner, Rubens, and their sales agents told investors they were purchasing shares of TDI, when in fact, they were not.  In approximately late 2011, TDI had terminated its relationship with Premiere.

46.     Advanced Equity, Kirschner, Rubens, and their sales agents generated and forwarded false documents to investors, including, in some instances, stock purchase agreements.   In addition, Advanced Equity sales agents generated and forwarded false transaction confirmation letters to investors indicating purchases of TDI stock.  But instead of delivering shares of TDI, as agreed upon, investors received shares of Advanced Equity or, in some cases, no shares at all.

47.     For example, an investor from California referenced TDI on two of the checks he express mailed to Advanced Equity along with a letter that stated, "Enclosed are checks totaling $50,000 for the purchase of 20,000 shares of TDI, Inc. stock."  This same investor executed a

stock purchase agreement reflecting the purchase of TDI common stock and received a TDI stock purchase confirmation letter from Advanced Equity. Nonetheless, the investor received shares of Advanced Equity. The investor testified there never was any question that he purchased TDI stock. All the conversations with Advanced Equity sales agents, including Kirschner, and all the paperwork he received from Advanced Equity confirmed a transaction for TDI stock. There simply was "never any discussion of anything else."

#### 4. *Use of the Technology*

48.     Sales agents, on behalf of Premiere and Advanced Equity, promised investors that TDI's laser-line technology would be used during NFL preseason and regular season games. In some instances, sales agents told investors the NFL had agreed to use TDI's technology during the 2013 Super Bowl.

49.     The representations were false. Premiere and Advanced Equity's sales agents had no basis for these statements. TDI did not have any agreements with the NFL or any team to feature its technology during football games, let alone at the Super Bowl.

50.     For example, one individual invested an additional $75,000, after previously investing $2,500, based on promises of a pending TDI IPO, because a sales agent of Advanced Equity told him that NFL Commissioner Roger Goodell purportedly "purchased" the technology for the league for use in the Super Bowl.

### COUNT I

### Violation of Sections 5(a) and 5(c) of the Securities Act of 1933

51.     The Commission realleges and incorporates paragraphs 1 through 36 of this Complaint.

52.     No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities and transactions described in this Complaint and no exemption from registration existed with respect to these securities and transactions.

53.     As described above, the Defendants directly or indirectly: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement was in effect; (b) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; or (c) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus of otherwise, securities as to which no registration statement has been filed.

54.     By reasons of the foregoing, the Defendants violated, and, unless restrained and enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## COUNT II

### Fraud in Violation of Section 17(a)(1) of the Securities Act

55.     The Commission realleges and incorporates paragraphs 1 through 50 of this Complaint.

56.     From no later than July 2011 at least until November 2012, the Defendants directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by use of the mails, in the offer or sale of securities, as described in this complaint, knowingly, willfully or recklessly employed devices, schemes or artifices to defraud.

57.     By reason of the foregoing, the Defendants directly and indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT III

### Fraud in Violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act

58.     The Commission realleges and incorporates paragraphs 1 through 50 of this Complaint.

59.     From no later than July 2011 until at least until November 2012, the Defendants directly and indirectly, by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, in the offer or sale of securities: (a) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (b) engaged in transactions, practices and courses of business which operated and will operate as a fraud or deceit upon purchasers and prospective purchasers of such securities.

60.     By reason of the foregoing, the Defendants directly and indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(2) and 77q(a)(3).

## COUNT IV

### Fraud In Violation of Section 10(b) and Rule 10b-5 of the Exchange Act

61.     The Commission realleges and incorporates paragraphs 1 through 50 of this Complaint.

62.     From no later than July 2011 until at least until November 2012, the Defendants directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails in connection with the purchase or sale of the securities, as described in this complaint, knowingly, willfully or recklessly; (1) employed devices, schemes or artifices to defraud; (2) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) engaged in acts, practices and courses of business which operated as a fraud upon the purchasers of such securities and will operate as a fraud upon the purchasers of such securities.

63.     By reasons of the foregoing, the Defendants directly or indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5.

## COUNT V

### Violation of Section 15(a) of the Exchange Act

64.     The Commission realleges and incorporates paragraphs 1 through 36 of this Complaint.

65.     From no later than July 2011 at least until November 2012, the Defendants while acting as or associated with a broker or dealer, effected transactions in, or induced or attempted to induce the purchase or sale of, securities while they were not registered with the Commission as a broker or dealer or when they were not associated with an entity registered with the Commission as a broker-dealer.

66.     By reasons of the foregoing, the Defendants directly or indirectly violated, and, unless enjoined, are reasonably likely to continue to violate, Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

**RELIEF REQUESTED**

**WHEREFORE,** the Commission respectfully requests the Court:

**I.**

**Declaratory Relief**

Declare, determine and find that the Defendants have committed the violations of the federal securities laws alleged in this Complaint.

**II.**

**Permanent Injunctive Relief**

Issue a Permanent Injunction restraining and enjoining the Defendants, their officers, agents, servants, employees, attorneys, representatives and all persons in active concert or participation with them, and each of them, from violating Sections 5(a), 5(c), 17(a)(1), (2) and (3) of the Securities Act, and Sections 10(b) and 15(a) and Rule 10b-5 of the Exchange Act.

**III.**

**Disgorgement**

Issue an Order directing the Defendants to disgorge all ill-gotten gains, including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

IV.

**Penalties**

Issue an Order directing each of the Defendants to pay a civil money penalty pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

V.

**Penny Stock Bar**

Issue an Order barring Kirschner and Rubens from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), for the violations alleged in this Complaint.

VI.

**Further Relief**

Grant such other and further relief as may be necessary and appropriate.

## VII.

### Retention of Jurisdiction

Further, the Commission respectfully requests the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,

September 26, 2013

By: _____

Kevin B. Hart
Staff Attorney
S.D. Fla. Bar No. A5501875
hartk@sec.gov
Direct Dial: (305) 982-6321
Facsimile:  (305) 536-4152

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
801 Brickell Avenue, Suite 1800
Miami, Florida  33131
Telephone:  (305) 982-6300